Good afternoon. I was defense counsel in my first capital trial in 1969, and I'm aware that much stricter standards and more exacting standards for trial counsel have developed since then. But this 1980-1981 trial, in this case, and I choose my words carefully when I say this, trial counsel's pathetic performance and the prosecution's disregard of its fundamental duty to disclose material exculpatory evidence violated basic due process standards that existed long before 1969. There can be no doubt that because of the constitutional failings of both trial counsel and the prosecution in this case, jurors were presented with false pictures of the two main characters in this case, William Acker and Jesse Gonzalez. And I'd like to talk first about William Acker. And Mr. Acker, as the Court knows, is relevant to five claims in this petition. There are claims relating both to guilt and to penalty. I'm sorry, Your Honor, if I didn't ask before, I wonder if I could have five minutes for rebuttal here. You certainly may do so, counsel. Will you be able to note the time on the clock there? I think so. 2830 at the moment? I got it. Okay. All right. Thank you. Counsel, may I suggest there are a lot of ineffective assistance of counsel issues and due process violations. I want you to be sure that you address the Brady issue, which I find to be quite important. I'm going to address both with respect to Acker, both counsel's failures and the Brady issue. Very well. With respect to Acker, I think that what we have to keep in mind is that, first of all, Acker was a critical witness, contrary to whatever Appleby may say. He was a critical witness. In fact, the prosecution, and when I make these statements to the Court, if at any time I want any kind of citation to the record, stop me and I will provide the citation to the record. The prosecution sought death on the basis of Acker's testimony. And according to the prosecutor's internal memorandum, the retrial of the penalty phase depended on Acker's availability as a witness. Additionally, defense counsel recognized that Acker was a critical witness. Additionally, the only testimony that the jurors requested to be re-read were Gonzales' testimony and Acker's testimony. The State Trial Court stated Acker's testimony, quote, was critical, close quote, to the prosecution as a whole. This is establishing the only alleged special circumstance, and that being the killing of a police officer and the performance of his duties. Can I just interrupt for just a moment? This is Judge Fletcher. You just said that the jury asked for Gonzales' and for Acker's testimony to be re-read. That must have been at the guilt phase, because Gonzales, of course, doesn't testify in either of the penalty phases. That's correct. And the death penalties imposed, of course, not after the first, because we had a hung jury for 9-3 the first time, but only after the second. Were there any re-readings requested by the second penalty phase jury? No, but at that time guilt had already been established. No, I understand that. Right. Yeah. So it was critical both as to guilt and as to penalty, as I'll point out. One of the district court judges in this case stated the prosecution, quote, relied heavily, close quote, on Acker to prove a principal issue in this case, Gonzales' state of mind when he shot the officer. In fact, no other witness testified that Gonzales knew of the raid in advance or that a warrant was about to be served. No other witness testified Gonzales stated he had planned to shoot an officer and then planned to fabricate a defense. The importance of Acker is very much like the jailhouse informant in Maxwell v. Roe who linked Mr. Maxwell to the palm print related to the homicide by a purported confession by Maxwell in which Maxwell allegedly told him that he had made a mistake by not wearing gloves. Now, here was a picture that was presented of Acker to jurors. The jurors were told that Acker was a jail inmate who had never before informed anybody else before Gonzales, including his wife. Later he testified he had provided information against his wife on a Hawaii murder case, and we'll talk about that later, and on a jailhouse murder. What information he provided was never told to the jury. And this is very important. As to Mr. Acker's motive for testifying, the jury had a picture of an individual who was testifying against Gonzales because despite his previous bad behavior, despite his previous conviction, it was, quote, a step in the right direction. And although he was not, although he was hopeful of receiving some consideration from, strike that, although he was not hopeful of receiving any consideration for his testimony, it was just because it was a step in the right direction. And later in the penalty retrial, he testified that he was testifying because he wanted to achieve moral balance. He did admit to a 1980 conviction for, quote, felony murder, for which he was serving a life sentence. And then he testified that although he could have lied in the past, and this is in quotes, he was not lying now about Gonzales because he was not capable of lying now. And here's the Acker, the real Acker, that was not presented to the jury. Now, you have to keep in mind that Acker testified at a time in Los Angeles County when jailhouse informants were being used in a manner that led to condemnation of that, of the district attorney's office for the use of those informants. And the basic grand jury finding was that jailhouse informants manufactured testimony. There was no express benefit given to them, but there was an implied benefit which they later received. And all these jailhouse informants knew this. And the grand jury report is noted by the panel decisions in Maxwell v. Rowe and also United States v. Bruno Oveso, which is cited in our briefs. Can I interrupt you with respect to the grand jury report? I've read the grand jury report, and it covers the period during which Mr. Acker testified both at the guilt and the penalty phase. But the report names no names whatsoever. No. But I'm about to ask the question. Okay. Do we know or is it publicly available knowledge who testified in front of the grand jury, or is that a secret? That is not available. So as far as we can tell, as far as we're able to know, Mr. Acker might even have been someone about whom testimony was given during those hearings. We just don't know. May or may not have. Okay. So the fact that he's not mentioned there doesn't tell us much one way or the other. We do know that the report says that this went on routinely during the period of his testimony in 1981. That's correct. But having tried cases at that time, and I know this may not be on the record, it was common knowledge. Well, here's a real accurate. Before he met Gonzalez, he had in fact given information to law enforcement on the Hawaii murders in which he was involved, and we'll talk about it a little bit more. And he had given jailhouse confession, purported jailhouse confessions by inmates in other cases, including the La Scola case, which I'm going to talk about a little bit more later. There was evidence, in fact, that Acker admitted in February of 1980, six months before testifying against Gonzalez, that he was a police informant who expected benefits for his testimony. Now, Acker first testified against Gonzalez on August the 19th of 1980. In addition, here's a picture of Acker that the jury didn't hear. After May of 1978 and before testifying against Gonzalez, Acker had committed six to eight robberies by himself and 15 robberies together with his wife. Acker was an individual that was characterized in reports available to counsel in the possession of the prosecution as, quote, totally committed to the criminal way of life. He, quote, enjoyed committing robberies and planned on doing many more if given a little time. He could rationalize his robberies so that everyone would agree that he had a right to do them. And as to his 1980 felony murder conviction, he was convicted also of personally using a firearm in connection with the murder. This was a case where the victim was shot in the head twice. Now, why is that important? That's important because soon after he was arrested for this murder, Acker attempted to blame the killing on his 19-year-old wife. He said he didn't do the shooting, but his wife did it. And the personal use of the firearm conviction was in the possession of the prosecution and could have been obtained by the defense, but the defense didn't have that. Now, after he pled guilty to this murder, again, we're talking about the murder where he used the firearm, and before testifying against Gonzalez, Acker denied he committed it and said he expected to be released from prison and had, quote, no particular feeling about committing robberies. And additionally, he was involved in additional crimes in Hawaii, including a murder that was being investigated by Hawaii police, to which he was connected by ballistics evidence from the Los Angeles murder to which he had pleaded guilty, although afterwards he denied that he was the shooter in the case. Counsel, with respect to the Brady aspect, how much of this background, by way of his criminal record, was not known to counsel, was not given by the government to counsel? All of it. Well, no. He knew some. He knew some. You get precise as to what he had. You want to know what he had? He had the rap sheet with three entries on it that was given to him the day before jury selection. That's what he had. That's what he had. Now, by the time we get to the second penalty phase, he, in fact, even by the time we get to the first penalty phase, I read both of those, he has information about Acker informing on others, six or seven others. So that might not have been given to him, but at some point, I'm not sure how to pronounce it, Mr. Ben-Kenge got that information. Because he's using it in cross-examination in both penalty phases. About informing on others? About informing on others. That's correct. I don't recall that. I take it word for word. Yeah, he doesn't. He's a very ineffective cross-examiner, but he does have that information. Okay. And whether the state gave it to him or whether he found it on his own, I don't know. Okay. Well, I think that's contrary to his deposition, which I'm going to get to, where he says that had he known all this stuff, he would have used it. Well, most of the stuff in his deposition is these psychiatric reports that are very, very damning that it's clear he did not have. Yes, he would have used this. Yes, he would have used that. Yeah. But an awful lot of his deposition, and this is now Mr. Ben-Kenge, is I can't remember, I don't know, I didn't review the transcripts. Okay. And in addition, you know, there was some cross-examination, Your Honor, about his expectation of a transfer. But the importance of that was really not brought home to the jury. And it wasn't brought home to the jury because what the jury didn't know, that it was so important to him that Acker had attempted suicide three or four times just to get a transfer. And that information was available. In 1971, he had a fake suicide attempt to be placed in a hospital to make it easier for him to escape. In addition, he had memory problems, couldn't remember two of his three suicide attempts or drug overdoses, and admitted problems with his memory and need for psychiatric treatment. He had, quote, thought disturbances, claimed, quote, an outside force was responsible for his criminal behavior, and blamed his wife for the, quote, evil influence, close quote, in his life. He was diagnosed by prison staff before testifying against Gonzalez as a, quote, disturbed individual, close quote, who was a predator, quote, capable of any measure of brutality to achieve his end. Intelligent, manipulative, unscrupulous, mentally unstable, with a severe personality disorder, he was diagnosed twice as schizophrenic. But the ultimate concealment of who Acker really was, and I think this goes to the Brady issue or one part of it, is when Justice Stephen Trott, who was then a supervising district attorney within the district attorney's office, was using Acker as an informant in the La Scola case. This was a homicide case that then Mr. Deputy Trott was prosecuting. And before the Gonzalez case, Mr. Trott dismissed the La Scola case because he had no confidence in Acker's credibility. This is the same district attorney's office that's prosecuting Acker, that's prosecuting Mr. Gonzalez on the basis of Acker's testimony. I'm not sure what would be, what would you expect to have turned over in that context? I mean, plainly, we happen to know Steve Trott, and he now has the word judge in front of his name. Suppose the guy's, the prosecutor was Joe Smith. Wouldn't have the same resonance today, and I'm not sure that the fact that a prosecutor in a different case decides not to go forward because he doesn't have confidence in a witness is something you'd expect to be turned over as part of Brady material. Well, but, okay, let's say Joe Blow is not Joe Blow, a deputy DA. This is a supervising district attorney who is of, not just another deputy district attorney, who dismisses a case because he has a critical witness on a homicide case who he finds to be not credible, not believable, someone on whom a prosecution should not be based. There is a memo on that as to every DA, when he dismisses a case, writes a memo. And then you have another DA prosecuting in the same office another individual on the basis of this same informant's testimony. Isn't it crystal clear that that should be turned over, the fact that it was dismissed and the reason for the dismissal? Well, Judge Trott's deposition, now this is now, he's at this point, Judge Trott, but remembering what did happen. I do remember that. In his deposition, he said, well, there were two informants, there was a primary informant, and his testimony fell apart. And I was left with the informant testimony from Acker. Acker was not as important a witness in Judge Trott's term. Acker was just a, quote, caboose. And he just didn't think the case was worth going forward with Acker. There's certainly some implication that he didn't particularly believe Acker, but he really dropped the case because his primary informant became incredible. That may be. That may very well be, but here's what Mr. Trott had to say about Acker. He considered Acker, quote, a classic psychopath, a monster. But that surely can't be Brady material. That's what's developed in the deposition years later. What I'm trying to figure out, what exactly is it that you contend should have been turned over that wasn't turned over, that was in existence at the time? I mean, that Judge Trott testifies years later about his impression. That plainly wasn't in existence at the time that it should have been turned over as Brady material. What was? Respectfully, I disagree. Okay. That was his impression at the time. Sure. But he's testifying years later. But he was testifying as to his impression at the time. That was his impression at the time. But to follow up on Judge Clifton's question, there may be two or three prosecutors in the office. One prosecutor believes the informant or sufficiently believes the informant that he's willing to use that person. Another prosecutor in the office says, you know, I just don't think so. I'm not using him in my case. That sounds like an internal division of opinion within the office. I'm not sure that's Brady material, that one of the prosecutors doesn't really trust the guy. Not if you have a supervising DA. But there's more. I mean, there's more. It's not just this. But I think if you have a supervising DA, if you know the structure of the DA's office, you're not just talking about one prosecutor and another prosecutor and a difference of opinion. We have a DA who supervises other DAs, and his opinion, it would seem to me, would carry more weight than just another trial. Okay. But be that as it may, the important thing that the prosecutor had was, number one, the correct rap sheet. Showing the use of the firearm conviction. But more importantly, they had the diagnostic study. And that diagnostic study had a trove of material that could have been used on cross-examination. Yeah. Well, counsel, you've laid out all of these reports and factors affecting Mr. Racker's, let's say, credibility. But as we look at it, we have to determine whether if counsel had been provided these materials by the government, that there was a, quote, reasonable probability, unquote, that the sentence would have been different. How do you meet that obligation? Well, that's why I presented the ACCR that was presented to the jury. And you have the ACCR, the real ACCR, that was not presented to the jury. And I suppose you have to make a judgment whether or not that meets the standard. Well, there was some impeachment made. Some. I'll just put that. Very little. Very little. Very little. The impeachment was pathetic. Yeah. Well, we do know that we had two penalty phase trials. I read both of them. The impeachment material available against ACCR in the second was largely the same. The only additional piece was the question about the paramount tattoo. I viewed the impeachment in both penalty phases as about the same. And yet we got a hung jury 9 to 3 on the first one. So, I mean, that suggests that, at minimum, this is a pretty close case. Yes. Yeah, no. I think it is. But I think to answer your question, Your Honor, I think when you look at the evidence that wasn't presented, just the psychiatric evidence that was available through the diagnostic study, the fact that this guy is schizophrenic, the fact that he has memory problems, the lengths that he will go to achieve his ends, the fact that he's testifying his purported testimony to achieve a moral balance and a step in the right direction, that's bunk. That was nonsense. But it was there. That's what the jury had, and there was nothing to contradict it. Well, assume that all of this was provided, and Mr. DeKanye, whatever his name is. Ben Kanji. Pardon? Ben Kanji. Ben Kanji. Okay. Assuming he made some use of it, what is it we look at at this stage, 30 years after the fact, to determine whether or not the jury would have not authorized the death penalty? Isn't it conceivable that the jury could still have believed what this, what Backer was saying? Yeah, but I don't think that's the test, whether it's conceivable or not. No, it's not the test. The test is even tougher. It is whether there is a reasonable probability that the sentence would be different. Yeah, I think it's a lesser standard. Conceivable is possibility. Reasonable probability, I think, is less than that. You're going the other direction, so that's less for sure. Yeah. But it just seems to me that when you – But help us with that. I mean, that's where I am on this right now. I'm trying to determine to what extent the – we would have to reverse and remand for a new penalty phase if your argument is compelling. I think what you have to do, Your Honor, the way I would look at it is, like I say, look what was presented to the jury. And in order to establish Backer as a witness, and then look what could have been presented, and you have to make a judgment call. Do you think that there's a reasonable probability that that would have made a difference? And you just look at all the factors. Sometimes it wouldn't have made a difference. For example, let me give you an example. The rap sheet that was presented had two additional convictions of Acker, one for grand theft and one for robbery. If that's all there was in this case, I think you would be justified in saying, you know, I don't think that there's a reason probably that would have made a difference because the jury already heard that he had been convicted of this felony murder. Two more lesser crimes probably would not have made a difference. But he got tons more here. He got much more here than that. And then you could have tied that into his statement to one of the psychiatrists that he wants to turn his life around. And, of course, as soon as he gets out, he goes out and commits all these additional crimes. Yes. And so now he's telling the jury, I'm trying to get a moral balance and turn my life around. Oh, haven't you said that before? I think that's right. I see I only have five minutes left, but I'd like to go on to talk some about the failure to investigate witnesses and penalty, if I might. It's your time, counsel. I know you're going to cut me off and I won't be able to come back, but I'll take my chances. All right. All right. With respect to the penalty investigation, I think the one basis where I find this to be very disturbing is that here we have a trial attorney in a death penalty case who relies on the defendant's mother on a Saturday to determine what witnesses to call for penalty. Now, at the state reference hearing, the referee found that there weren't any tactical constraints against the investigation of mitigating character or background evidence. And the referee found that easily located, law-abiding individuals would have testified to positive aspects of Gonzalez's character that would have demonstrated he had a loving relationship with his family, his children, was a good husband. Despite obstacles such as illiteracy, he assumed limited work responsibility. Well, the problem there is that, and this is where the wouldn't have made a difference may come into play, because the core of his defense was that he was such a prominent gang leader that this other gang was prepared to stage a home invasion. If his own defense casts him as being such a gang leader, that he's nice to dogs really isn't likely to have much impact. Well, I respectfully disagree. That wasn't the core defense. Not that he was a prominent gang leader. In fact, the evidence was that he hadn't had any involvement with gangs since 1970, that he had gang association in the past, but at that time he did not. So the core defense was not that he was a prominent gang leader. The core defense was that he thought that it was gang members coming into the house and that he did not know that there were police officers. And why does he think that if he's not currently involved with a gang at all? Well, there was evidence available and presented at the trial that the Bassett gang was in the neighborhood and that they would do home invasions. But why did they pick out him? I beg your pardon? Why pick out him? He's a nice guy. He's not involved with gangs. He's nice to children. Maybe because of his past involvement. There wasn't any evidence. There's no evidence in the record. Past involvement, which his character witnesses didn't know about. That's why I say it seems to me it's partly inconsistent with his defense. Well, in every penalty trial, if the jury does not know anything about the background of the defendant, if all they know is the little aspect of his life, that's the crime, it's a very difficult, very difficult for the defense to argue against the death penalty. A death penalty trial is something where the jury looks beyond the crime. In fact, the jury is instructed that this is a different situation now. They're not being asked. Guilt is assumed. So now you're being asked whether or not this individual should be put to death. And the reason the jury may put somebody to death is they don't like them for a myriad of reasons. But there was nothing presented to the jury in terms of any character elements that made him likable at all. All that the jury knew was, here's a guy who killed a cop. And he knew he killed a cop. And not only did he kill a cop, he fabricated a defense. That's all they knew about Mr. Gonzales. And also, there were significant cognitive deficiencies that Mr. Gonzales had that weren't presented. And that alone might be a reason to spare somebody's life because of his mental disabilities. But none of that was presented. And why did trial counsel not present it? Because he thought that poor reading skills were common in low-income communities for reasons unrelated to mental ability. And yet we know that experts were available to testify that Mr. Gonzales had organic brain damage. And that was verified after he was sentenced by the psychiatrists and psychologists who gave him tests at the Department of Corrections. All this could have been presented. We don't know why juries spare somebody and don't impose the death penalty. But you've got to give them something. Here the defense counsel gave him nothing. Counsel, your time has expired, but I do have one additional question. Going back to Acker again, are you contending that the Brady violation should also be considered with respect to the guilt phase or only with respect to the penalty phase? I'm saying with respect to both, Your Honor, in terms of the — because the guilt phase depends on the credibility of Acker with respect to the sole special circumstance that was alleged. Without Acker — Well, the special circumstance — but, I mean, that's — there's no question, but the decedent was a police officer. Oh, no, there's no question about that. But the defendant had to know he was a police officer engaged in the lawful performance of his duties. And then we have that other issue about the booing. Okay. But there was other testimony. Acker was not the only person that testified. Well, Acker was really the lynchpin on it. There was some evidence, I agree, from which the jury could have found that, although it was conflicting. All right. Thank you very much, counsel. Your time has expired. We'll now hear from the government.  You're welcome. Good afternoon, Your Honors. May it please the Court. Deputy Attorney General Joseph Lee on behalf of Respondent. Mr. Lee. As to the Acker claim, as the California Supreme Court noted, Acker's testimony was effectively impeached at both the guilt and penalty phase trials. His character, potential motives for lying, and hopes that he would obtain additional benefits in the future were all disclosed to the jury. So any additional information would not have painted a significantly different picture. But, of course, the California Supreme Court knew nothing of the psychiatric reports. That is true, but the question is, would it have been material? Would it have painted a significantly different picture of Acker's characters and motives? And I will discuss the cross-examination that took place at the guilt and penalty phase. Okay. But we can't put the normal creams we would put if this were almost a direct successor proceeding. The California Supreme Court, as Judge Fletcher points out, had none of this information. So I don't see how we can put much confidence in that. I'm sorry. Put much confidence in the impeaching evidence that was presented as well? No, no. In the quotation that you or at least in the recital you just made about the California Supreme Court, that was not in any sense as deep as this one is, all those psychiatric reports and this other information that came in later or that was discovered later. That's true. But the question is whether the evidence the Court had before it demonstrates that Acker was effectively impeached. Well, apparently we know he wasn't effectively impeached because the jury must have believed him. That there was impeachment evidence available doesn't really answer the question if there had been additional impeachment evidence available, whether the result would have been different. That's what we have here at this point. That's true. In effect, ineffective assistance of counsel is an issue that's being raised in this very proceeding. That's right. And the fact that the California Supreme Court at an earlier stage drew some conclusions with respect to that on a different record doesn't help us much, does it? Well, it does to the extent that it shows that he had been effectively impeached. That may be the phrase that causes trouble. I understand that's the phrase used, but in fact, do you believe that he was in fact impeached? I believe that his motives for lying, the fact that he was going to receive future benefits, were exposed. But was his propensity to lie exposed? I mean, it's the psychological reports that have caught the most of my attention. And they can be argued about substantially, but it seems to me kind of inescapable. They contain the seeds of some pretty powerful arguments that Acker is not somebody to be trusted. That's material the California Supreme Court did not have in front of it. So it had no way to opine on whether that would have made a difference. If they knew what we know, can we confidently say they would have come up with the same conclusion? Because I think the answer to that is no. We're stuck with having to look at a case that's different than the case the California Supreme Court looked at. So take a look at the psychological reports. Wouldn't you agree that's pretty damning with regard to trying to defend the credibility of witness Acker? I would agree that it would have been additional impeaching evidence had it been disclosed or had it been used. And the State Trial Court judge who initially permitted discovery, and it's something that the Supreme Court said it didn't have the power to do, made the explicit reference that Acker was a critical witness in the penalty phase. The California Supreme Court did not say that's not true. The California Supreme Court, as I understood it, said, well, there's nothing that So do we have anything that suggests the California Supreme Court did not believe that Acker was a critical witness for the penalty phase? I believe the California Supreme Court concluded in connection with both the Messiah Henry claim and the false evidence claim that any additional impeaching evidence wouldn't have painted a significantly different picture of Acker to the jury. Maybe we should move on, but the point is obvious. They did not have the evidence in front of them, the California Supreme Court, that we now have in front of us. And so they can't possibly say no additional evidence would have successfully impeached beyond the degree of impeachment because they had no idea what that evidence might be. Well, the question is, I mean, at what point do you impeach Acker down further to the point? I mean, what value is it of impeaching Acker further? Well, I assume your jury believed Acker. My conclusion, which I stated bluntly, is the jury must have believed Acker at the penalty phase because the case presented at the penalty phase was Bagocop. And Bagocop rested entirely upon Acker's testimony. No, that's not true, Your Honor. What did it rest on? If you impeach Acker's testimony down to zero and even throw it out, what you still have is Petitioner's statement to Deputy Verdugo that he was outside watering his lawn when he saw the cops coming. Okay. Then he went inside his house. Do you have anything other than that? Apart from that, you have just the circumstances of the raid and the incredibility of his story that he was under attack by the Bassett gang. I'm not sure the circumstances of the raid do it for you because the alternative case presented by the defense at the penalty phase was that, yes, he should have known they were cops, but, no, this wasn't the result of a deliberate plan. Not for premeditation, but not the Bagocop. I was reading the prosecutor's opening and closing arguments at the penalty phase, and the core theme is that this is a man who calculatedly went out and deliberately put together this plan because he wanted to kill himself a cop. Well, that's not something that arises because he spontaneously sees a cop coming toward him. That's something that depended upon the testimony of Acker that this was the man, that he had an advance, worried that the cops were going to raid and so forth. I don't believe it necessarily depended on Acker's testimony. Well, who else would have testified to it? Under California law, premeditation and deliberation can co- I don't know. Who else would have testified to the, quote, Bagocop, unquote? It seems to me that Acker was the only source of that. Was there another witness? Acker was the only source that Petitioner had known about this raid, sometime well in advance. However, if you take his statement to Deputy Verdugo and the circumstances of the execution of the raid itself, which clearly wasn't the type of actions that a rival gang coming to get Petitioner would be, I think there's still sufficient evidence of premeditation and deliberation and of the fact that he knew that Deputy Williams was a police officer. Now, I'm now talking not about impeachment and Brady with respect to guilt face. I think there was plenty of evidence without Acker to justify the jury having concluded that there was first degree murder of a policeman. Maybe the jury didn't have to decide that, but I think the jury was perfectly justified in deciding it based on the evidence it had in front of it without Mr. Acker's testimony. I'm talking now only to the penalty face. Mr. Acker testifies at the penalty face, as indeed he did in slightly different words at the guilt face, he testifies, well, he knew in advance that there was going to be a raid as much as quite a while as soon as that buy was made. He got a telephone call that morning between 2 and 3 in the morning. He concocted this story. He wanted to, quote, bag a cop, although I have to say in the second penalty face, which is what I'm addressing, the prosecutor used the phrase bag a cop eight times. Mr. Acker used it only once, suggesting to me that maybe the testimony was sort of helped along in terms of its emphasis. The question was, did you say bag a cop? And he said, well, you can say it down. I mean, the aggravating circumstance that makes Mr. Rodriguez, excuse me, Mr. Gonzalez, into a horrible, irredeemable villain deserving of the death penalty comes from Mr. Acker. It does, but as I stated, we still have Deputy Verdugo's testimony. Here's this Verdugo testimony. Verdugo says, it's not tape recorded, so we're entirely dependent on Verdugo. Verdugo says that Gonzalez said, I saw the cops coming, and I threw the hose down and went in. And then the conversation, according to Verdugo, goes on a little bit, and then Gonzalez comes, but wait a minute, you're confused. I didn't know they were cops then. Now, when he's talking to Verdugo, he knows they were cops, but I think it's quite questionable whether or not when he said to Verdugo, as Verdugo later recounts it without a tape recording, when I saw the cops coming when I was watering the lawn, boy, that's pretty weak. We do know that the cops testify, that they banged on the door and said, police, let me in, and the jury was perfectly entitled to conclude that he knew they were police at that time. But the evidence that he was going to bag a cop, that he deliberately decided he was going to, with some real forethought, is entirely from Akron. Well, I think the jury was entitled to believe that when he made that statement, then he realized that he had made a mistake, that he corrected himself because he knew that that statement hurt him. When you take that statement in conjunction with the circumstances of this raid, where the police pull up in cars that are not the type of cars that these gang members drove, they're not the age nor the ethnicity for the most part of gang members, they knock on the door, they knock and announce twice that they're police officers. Then, in addition to that, they take three or four tries to kick down the door, something that rival gang members would never do. Rival gang members, if they were coming to kill Petitioner, they would just pull up in a drive-by or they'd just start shooting, shooting the house up. And then, on top of that, when the police officers entered, they entered with their badges drawn and displayed. On top of that, there was testimony that the neighborhood that Petitioner lived in at the time was not the subject of any gang retaliation or activity. We also know that after the shooting, even after Petitioner realized that he had shot a police officer, he raised his hand in defiance and said, Viva Puente, and then cursed out the police officers and called them putos. So I think that under the circumstances, it's pretty clear that Petitioner knew that the people knocking at his door were police officers. But I'm not questioning that. That is to say, the jury concluded that we have first-degree murder of a police officer, and there was evidence independent of ACCA that that was so. What ACCA added was, I always wanted to get a cop. I knew way ahead of time this was a plan to get a cop. He's the only person to testify to that. I've got a slightly different question. We know from the memo that the prosecutor writes to then-supervisor Trott, although I gather Trott was not his direct supervisor at the time, not only that he's going to retry the penalty phase after the hung jury, but only if he can get ACCA as his witness. So he clearly regards ACCA as key to a penalty phase that's going to get death. We also know from that very same memo that in talking to the jury in the first penalty phase, the hung jury, he learned that all of the women believed ACCA and that the men tended not to believe him. The jury in that first jury was six men and six women. The second jury was 11 women and one man. Now, I've not read the voir dire. This was 81. Batson is 86. And JEB is in the early 90s that says you can't discriminate between genders in terms of choosing your, so there's no Batson violation here. But what am I to make of the fact that I think there's a pretty strong inference here that the prosecutor not only viewed ACCA as a key witness, but without whom he will not proceed in a penalty phase, and that he says the women believe ACCA, so I'm going to load up the jury with women. Well, first of all, I think the prosecutor was entirely reasonable to say that ACCA was important. ACCA definitely strengthened the premeditation and deliberation element of the case. More than that, the memo to Trott says I'm going to go forward if I can get ACCA. In other words, I'm not going to go forward if I can't. Not only is he important, he's the sine qua non. I can't do it without him. Well, to address your point regarding what we are to make of the fact that there were 11 women and one man on the second jury, without having reviewed the voir dire, without having understood the dynamics of jury selection, I'm really not at liberty to comment on why the composition of the jury. Well, I'm not charging Batson violation because Batson simply didn't exist. But the fact that we now have 11 women suggests to me that the prosecutor knows that ACCA is his key witness, as he says, and he knows that women believe him. I mean, this all goes to show that in the prosecutor's own mind, without ACCA being believed, I'm not getting the death penalty. It could go to suggest that. It could also go to the fact that the women just made better jurors when he selected them. I don't know. They did for him. For reasons maybe apart from the fact that it had to do with ACCA and his believability. We just don't know that, so I really can't comment on that. I'm sorry, Your Honor. I think the bottom line here as to Acker was that he was impeached at the guilt phase and even more thoroughly impeached at the penalty phase. And so to say that if there had been more evidence brought out, that it would have impeached him further to the point of somehow destroying his credibility. Would you compare the degree and the effectiveness of impeachment, not between guilt phase and penalty phase, but between penalty phase one and penalty phase two? Penalty phase one and penalty phase two. I think at both it was similar. And as this Court is well aware, counsel had succeeded in getting a hung penalty phase jury at the first penalty phase. Which tells me that, and I agree with your assessment, I think the impeachment was at about the same degree of effectiveness, which wasn't particularly good, in both of the penalty phases. We get a hung jury the first time around. We get a unanimous jury the second time around with 11 women. But that very fact that we get a hung jury the first time around tells me that this is already a very close case and it won't require a lot more impeachment to tip it. I think what it shows is that the strategy that he employed at the penalty phase, and this is kind of touching on the fact that he didn't offer up any character evidence at the penalty phase. I think the fact that he achieved a hung first penalty jury shows that trying that same theory, which had been successful before the first penalty jury, before an entirely new jury was totally reasonable in his circumstances. Counsel, I think we're mixing ineffective assistance of counsel and Brady here in our discussion. Focusing on Brady specifically, what explains the absence of all of this material that eventually was turned over? But what explains the fact that counsel did not receive this material? I'm not sure. I mean, I think as to some of it, I don't think that it was viewed as being material information under Brady in the sense of impeachment as to character. All right, talk about the psychiatric reports. Those are certainly materials, certainly impeaching, are they not? Are you arguing that they're neither material nor impeaching? No, I would say that they were. And I think the question here that this Court has to decide is whether any additional impeaching information would have painted a significantly different picture of actors, characters and motives to the jury. And I don't think it would have here. Okay. Elucidate on that. I think that's right where we are here. Well, I can talk about, first of all, what counsel established during his cross-examination of Acker at the guilt phase. He established that Acker had told the police about his conversation with Petitioner the day he was going to be sentenced, or prior to being sentenced, the inference being that he hoped it would help him get a better sentence. He established that people were after him in jail and that he didn't like gangs. And obviously Petitioner was a gang member, a gang leader, which may have given him the motive to snitch on him. He had informed on his own wife's role on a murder and given information about two other cases prior to informing on Petitioner. He said he hoped his testimony would help him in getting sent to an out-of-state prison. He was asked whether he was hopeful that perhaps later he might get some help with the parole board. He testified that he was testifying to, quote, take a step in the right direction, not because he expected anything, which obviously conflicted with his hope that his testimony would help him get transferred to an out-of-state prison. Deputy Ahn, the person he went to with information on Petitioner's case, was a deputy sheriff who prosecuted him. And Petitioner's case obviously involved the killing of a sheriff's deputy, the implication there being that he was seeking to curry favor with law enforcement by helping them in a case involving one of their own as a victim. Acker testified that he thought his testimony against Petitioner would, quote-unquote, hold weight in getting him moved to an out-of-state prison or protective custody. He admitted that it was possible that he could have transposed the facts about this case, i.e., switched rival gang member for police. But he said that's not what happened. He also says then that in the past he probably could have transposed facts, and not anybody is capable of doing it. So I think- Well, you heard Mr. Overland's summary of this psychiatric material, which could be summarized in the word pathological liar. If some of that had come out, why might that not have made a difference? I think for the reasons that I already mentioned. It was exposed that he had a motive to lie. You mentioned about actual lies. Actual lies? Like anybody, he said he had the potential of lying, but he was not lying here. Psychological report detailed some pretty damning indications. This man will lie about most anything if it will help him, for example, get to an out-of-state prison. He either feigned suicide or actually attempted suicide for that purpose. That's true, but the question is did Acker lie? So the question I ask is anything that you just gave us, did it show actual lying? He acknowledged the potential. Anybody can lie. Did he acknowledge that he, in fact, had lied early and often or at all? No, Your Honor. Isn't that different? Well, the thing about this is that Acker's testimony has never been proven false. The fact that he may have testified that he may have lied in other cases doesn't establish that he lied in this case. Was it established that he had lied in other cases? Is any of the impeachment testimony you just summarized to us, did it demonstrate actual lies? I'm not sure. I mean, it may have indicated that he was manipulative and that he was a con man and that he had told lies. I'm not sure if it showed that he had lied in any cases involving any other defendants. I mean, anything that was offered up as impeachment evidence demonstrate an actual lie on the part of William Acker? I can't recall. All I can say is that I can't recall any proven lies. There definitely was no proven falsity of Acker's testimony in this case. Well, now we have these psychological reports that say such things as he is either prepared to lie or prepared to kill himself or threaten to kill himself to get moved to a different jail. It says he promised that he was setting his life on the right path and straightening himself out just before he was released, whereupon he committed several additional felonies. Well, it did diagnose him in at least two separate reports as being schizophrenic. Well, it showed that he definitely had selfish motives and that he would do things for himself. It showed some things that were duplicative and some things that seemed not to be duplicative. Which didn't necessarily involve testifying against, falsely against, people in cases. But you don't think anything. The fact that he may have lied about certain things. You don't think anything in the psychological reports, the nothing there added something different to what was offered up to the jury? Not materially different. I don't believe so, Your Honor. Moving on to the claim of character evidence at the penalty phase. First and foremost, as I pointed out earlier, it has to be remembered that the theory of mitigation that counsel chose had already achieved a successful first outcome, a hung first penalty phase jury. So it was entirely reasonable for him to present that same theory of lingering doubt, which eschewed the presentation of any character evidence to a different jury, other than the one that had heard that had decided his fate at the guilt phase. Moreover, the California Supreme Court reasonably concluded that counsel's decision not to develop or introduce any background or character evidence was motivated by his fear that by doing so, he would open the door to damaging rebuttal evidence of petitioner's prior criminal acts. In particular, a 1972 incident which involved a gang rape, where the victim had named petitioner as one of three men who beat two women and raped another. And according to the police report, both women had been threatened with death if they prosecuted the case. And this is obviously far more damaging evidence than the store burglary in Serapong, cited by the district court in rejecting this claim, where the court held it was reasonable for trial counsel, in that case, to forego presentation of character evidence at the penalty phase, based on the concern that that burglary conviction could have been used in rebuttal. The other reason, as was pointed out, is the same concerns with presenting character witnesses at the guilt phase apply at the penalty phase. These witnesses would have been cross-examined regarding their purported ignorance of petitioner's gang and narcotics activity. So they would have appeared to either have been clueless about petitioner's true character or plainly biased on his behalf. And as was pointed out, this cross-examination in and of itself could have weakened petitioner's theory of lingering doubt. His theory was that he was a well-known Barrio Puente gang leader who would have been a likely target by the Bassetts, and that therefore he had shot Deputy Williams because he mistakenly believed he was under attack by the Bassetts. At the same time he was claiming this, his own family members and friends would all have claimed that they were unaware of this, and therefore they might have questioned how believable was his claim that rival gangs knew who he was, and therefore in turn questioned his claim of mistaken identity.  Can you tell me why we had a different penalty phase jury after we had the guilt phase? I know why we had this different penalty phase jury for the second penalty phase. Why did we have a different penalty phase jury for the first penalty phase? I'm not aware of that. You're not aware of what? You're asking me that there was a different first penalty phase jury? Yes, there was a guilt phase jury, then there was a new jury impaneled for the first penalty phase. I... You didn't know that? I didn't know that, and I can't come on and know about that. Because the fact that we've got a new penalty phase jury for the first penalty phase accounts, in my mind, in fact, Mr. Bankangi basically says this, that's his strategy because this jury, the penalty phase jury, they didn't hear the trial. So he basically re-does the guilt phase trial so that they can understand the full context and understand, okay, only Acker is the person who tells you how this happened. But you can't... If you don't know that it's a new jury, you can't tell me why it's a new jury. This did happen 30 years ago. That's why it's entirely reasonable for counsel under the circumstances to think that, look, if I present the facts and circumstances surrounding the shooting to a new jury, it's entirely possible that at least one juror will have doubts about whether Petitioner knew he was shooting a police officer. I tend to agree with you on that point, yes. Anything further? Unless the Court has any further questions or concerns, I'd be willing to submit. No further questions. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. Thank you.
judges: O'scannlain, Fletcher W. , Clifton